C.M., Plaintiff,

v.

SOUTHEAST DELCO SCHOOL DISTRICT, William C. Donato, Bruce B. Morgan, Lancess T. McKnight, Paul Sanborn, Ralph E. Sorrell, Eugene De-Paul, and Thomas Schellinger, Defendants.

Civ. A. No. 91–3795.

United States District Court, E.D. Pennsylvania.

June 29, 1993.

Joseph M. Fioravanti, Curran Winning & Fioravanti, P.C., Media, PA, for plaintiff.

John M. Donahue, Harris and Silverman, Philadelphia, PA, Jeffrey P. Hoyle, William F. Holsten, II, Holsten & White, Media, PA, Robert B. Mulhern, Jr., Joseph T. Bodell, Jr., Swartz, Campbell & Detweiler, Philadelphia, PA, for Southeast Delco School Dist., William Donato.

Joseph T. Bodell, Jr., Swartz, Campbell & Detweiler, Philadelphia, PA, Andrew L. Braunfeld, Masterson Braunfeld Himsworth & Maguire, Norristown, PA, for Bruce B. Morgan, Lancess McKnight, Paul Sanborn, Ralph E. Sorrell, Eugene DePaul, Thomas Schellinger.

## *OPINION*

GAWTHROP, District Judge.

In this case, plaintiff seeks to recover under 42 U.S.C. § 1983 for damages he allegedly incurred as a result of alleged sexual, physical, and verbal abuse by one of his teachers at the Southeast Delco School District. Presently before the court are the motions for summary judgment of all defendants. Upon the following reasoning, I shall deny all the motions except that of defendant Bruce B. Morgan, whose motion I shall grant.

### BACKGROUND

From September, 1986, through June, 1988, plaintiff was a special education student in the seventh and eighth grades at Ashland Middle School in the Southeast Delco School District, a public school district in the Commonwealth of Pennsylvania. Plaintiff alleges that throughout the above period, he was subjected to sexual, physical, and verbal abuse and harassment by one of his special

education teachers, Robert Merker. Plaintiff further alleges that the school district and the individual defendants, all school administrators, knew or should have known about Mr. Merker's offensive and abusive conduct with respect to plaintiff and other students and former students. Finally, plaintiff alleges that the school district and the individual defendants, acting within the scope of their employment, adopted and maintained a practice, custom, or policy of deliberate or reckless indifference to Mr. Merker's conduct, and that they failed in their affirmative duties to provide for the safety and well-being of their students.

In his response to defendants' motions for summary judgment, plaintiff summarizes the deposition testimony of a number of witnesses. When examining a motion for summary judgment, the court must view the facts in the light most favorable to the non-moving party. Here, plaintiff is the non-moving party. Therefore, most of the following description is derived from the deposition testimony to which plaintiff pointed in his response. Of course, the court has verified all of plaintiff's assertions by referring directly to the cited portions of the deposition transcripts and by reviewing the depositions generally.

One of the witnesses, Kathryn Ashbridge, was, like Mr. Merker, a special education teacher at Ashland Middle School. Ms. Ashbridge testified that she began to notice Mr. Merker's abusive and offensive behavior in January, 1986. This behavior included slapping students' heads, striking students with his fists and other objects, throwing students through his classroom doorway into the hall, slamming students into lockers, spraying students with water and Lysol, and forcing students to sit in a trash can.

Ms. Ashbridge also testified that Marie Pennestri, Mr. Merker's aide, who is now deceased, had told her that Mr. Merker called his students names such as "worm," "faggot," "gay," "stupid," "retarded," and "asshole." Ms. Pennestri also told Ms. Ashbridge about Mr. Merker's giving of detention to students. Mr. Merker's detentions often required students to stay in his classroom beyond the time at which the last school bus departed. Mr. Merker would then drive these students home personally.

Next, Ms. Ashbridge testified that Ms. Pennestri had told her that she had described Mr. Merker's activities to defendants Bruce B. Morgan, superintendent of the Southeast Delco School District, and Ralph E. Sorrell, principal of Ashland Middle School, and that she had requested to defendant Lancess T. McKnight, assistant superintendent, that she be transferred out of Mr. Merker's classroom because she could not stand working with him any longer.

Ms. Ashbridge also testified that some of Mr. Merker's male students told her that they sometimes brought their belongings with them on Fridays so that they could spend part of the weekend with Mr. Merker. Other students told her that they were afraid to enter Mr. Merker's classroom.

Ms. Ashbridge further testified that she described Mr. Merker's conduct—both that which she witnessed personally and that which Ms. Pennestri had described to her— to Mr. Sorrell in the spring of 1986 and in the spring of 1987, and to defendant Eugene DePaul, assistant principal at Ashland, at various times during the 1986–87 school year.

During the summer of 1987, defendant William C. Donato became superintendent at Southeast Delco, defendant Paul Sanborn became principal at Ashland, defendant Thomas Schellinger became assistant principal at Ashland, and Ms. Ashbridge became Team Leader of the Special Education Department at Ashland. Ms. Ashbridge testified that, during the summer of 1987, she described Mr. Merker's verbal, physical, and emotional abuse to Mr. Sanborn, advising him that she believed that Mr. Merker was sexually abusing his students. During the 1987–88 school year, Ms. Ashbridge continued to report Mr. Merker's conduct to Messrs. Sanborn and Schellinger.

Next, plaintiff offers the testimony of another teacher, Karen Manners. Ms. Manners occupied the classroom adjacent to Mr. Merker's. In the spring of 1986, Ms. Manners told then-Principal Sorrell about disruptively loud screaming and banging in Mr. Merker's classroom, and she expressed her

concern about the safety of Mr. Merker's students. She also told him about the late detentions and rides home given students by Mr. Merker, and about a fight in the hall between Mr. Merker and a student. Ms. Manners testified that she went to new-Principal Sanborn at various times during the 1987–88 school year to describe Mr. Merker's conduct, including the abusive in-class behavior, the late detentions, and the rides home. Ms. Manners also testified that students, including plaintiff, often complained to her about Mr. Merker's wrongful handing out of punishments and detention.

Finally, Ms. Manners testified that she sometimes observed Mr. Merker prohibiting students from leaving his classroom by barricading himself in the doorway, although apparently she did not bring this to the attention of the administration.

Michelle Doonan, a teacher's aide in Mr. Merker's classroom, testified that Mr. Merker often referred to his students as "gay" or "whores." She testified that she once observed Mr. Merker holding a male student's head between his legs in a "scissors hold," and that she often observed him applying what he called the "Vulcan Death Grip" to students' necks. She observed Mr. Merker touching students, including plaintiff, and punishing students, again including plaintiff, with late detention. Also, she said that some students had told her that Mr. Merker often wanted them to go places with him after school, and that she sometimes saw Mr. Merker with students outside school. She said that she reported most of these incidents to Ms. Ashbridge rather than Principal Sanborn or Vice Principal Schellinger because any discussions she had ever had with Messrs. Sanborn and Schellinger had had no effect. In previous meetings with Messrs. Sanborn and Schellinger, Ms. Manners had gotten the impression that the two would never do anything about Mr. Merker.

Another aide to Mr. Merker, Marie Galbraith, also testified about Mr. Merker's name-calling, ridiculing, physical abuse, and late detention of students, including plaintiff. She also observed Mr. Merker applying the "Vulcan Death Grip," with which he would sometimes lift students, including plaintiff,

out of their chairs by holding the backs of their necks. Both Ms. Manners and Ms. Galbraith both testified that students would often cry out for help. Further, Ms. Galbraith testified that Mr. Merker frequently and openly looked up the dresses of female students, and would often ask them with whom they had slept the previous night. Once, she observed him tripping a female student and then picking her up by her breasts.

Ms. Galbraith testified that, beginning in September, 1987, she discussed Mr. Merker's conduct with Vice Principal Schellinger approximately once a week. When nothing was done, the conversations diminished to perhaps once a month. According to Ms. Galbraith, Mr. Schellinger's only response was to occasionally visit Mr. Merker's classroom. She also said that Mr. Merker would, not surprisingly, change his behavior when Mr. Schellinger was in the room.

In addition, Ms. Galbraith testified that Mr. Merker sometimes told her about his contact with students outside school, such as his hiring of students to help paint his house or do other chores.

Further, Ms. Galbraith said that she had noticed that Mr. Merker seemed to pay particular attention to plaintiff. On one occasion, plaintiff came to her and told her that he refused to go into the classroom because he was afraid of Mr. Merker. On another, plaintiff refused to stay for detention, again telling Ms. Galbraith that he was afraid of Mr. Merker.

Ms. Galbraith testified that she reported all the above-described conduct to Vice Principal Schellinger. She also testified that, in October, 1987, and at one other time later in the school term, she fully informed Principal Sanborn of Mr. Merker's conduct, and that, at some point during the 1987–88 school year, she informed Assistant Superintendent McKnight.

Ellen Green, a ninth-grade special education teacher at Academy Park High School, testified that her students, many of whom had been in Mr. Merker's classes the previous year, often complained to her about Mr. Merker's behavior. She said that, from ap-

proximately 1977 through approximately 1990, she spoke with Assistant Superintendent McKnight approximately three to four times per school year, often raising her concerns about Mr. Merker. Ms. Green also testified that it was common knowledge within the school district that in 1986 Mr. Merker's contacts with children had been investigated by the Darby Township Police Department.

Principal Sanborn testified that he spoke with Ms. Ashbridge in October, 1987, and several times thereafter, about Mr. Merker's use of profanity and sexually oriented language and his unauthorized touching and physical abuse of students. He also acknowledged that he spoke to Ms. Manners about Mr. Merker in November, 1987, and several times thereafter. Further, he said that he may have discussed Mr. Merker with Ms. Galbraith and Ms. Doonan. Mr. Sanborn also said that he always kept Mr. Schellinger fully informed about the reports on Mr. Merker. According to Mr. Sanborn, he and Assistant Principal Schellinger jointly decided that the appropriate way to handle the situation was to quietly observe Mr. Merker.

Mr. Sanborn testified that, during the 1987–88 school year, he and Mr. Schellinger informed Superintendent Donato two or three times about Mr. Merker's conduct, and that he also had shared information about Mr. Merker with Assistant Superintendent McKnight.

Finally, plaintiff brings to the court's attention one specific incident. Ms. Ashbridge testified that, in the late fall of 1987, plaintiff came to her numerous times to request that he be transferred out of Mr. Merker's classes because he was afraid of Mr. Merker. He described to Ms. Ashbridge how Mr. Merker would drive him home from school, driving past plaintiff's house to drop off all the other children first, and then taking an indirect route to plaintiff's house, sometimes parking the car in undesirable neighborhoods and leaving plaintiff alone inside for up to an hour. He told her that Mr. Merker would ask him to sit closer and that Mr. Merker

would rub his hand on plaintiff's knee and upper thigh, making sexual remarks and one time touching his genitals.

Ms. Ashbridge reported plaintiff's account to Principal Sanborn. Later, Mr. Sanborn asked Ms. Ashbridge if she thought plaintiff would repeat his description in front of others. She told him that plaintiff had told her that he would do so as long as she was present. She also suggested that Mr. Sanborn bring in a child-abuse expert to try to get more information out of plaintiff. According to Ms. Ashbridge, Mr. Sanborn told her that he had contacted Superintendent Donato, and that the two of them had decided that Vice Principal Schellinger and Frances Winkler, the school nurse, would interview plaintiff in Ms. Ashbridge's presence. However, the interview was scheduled for December 10, 1987, at 1:00 p.m., a time when Ms. Ashbridge was teaching. No one came to relieve her, and the interview went forward without her. When she arrived, the interview was over, and she found plaintiff depressed and red-faced, with his head in his hands. Ms. Winkler told Ms. Ashbridge that plaintiff had told her everything he had told Ms. Ashbridge, except that he had not said that Mr. Merker had touched his genitals.

After the interview, Ms. Ashbridge and Ms. Winkler met with Messrs. Sanborn, Schellinger, and Donato. According to Ms. Ashbridge and Ms. Winkler, Mr. Donato telephoned the school solicitor, who advised him that nothing could be done about Mr. Merker. Mr. Donato allegedly told everyone to keep the incident quiet and not tell anyone about it. Mr. Donato denies these allegations. In any event, Mr. Donato instructed Messrs. Sanborn and Schellinger to monitor Mr. Merker's classroom and to inform Mr. Merker that he was to stop driving students home and that he was to be out of the school building by 4:00 p.m. every day. They did so. In addition, Mr. Sanborn set up a file documenting the reports about Mr. Merker. No one informed plaintiff's parents of the incidents or the interview. According to defendants, no evidence of sexual misconduct by Mr. Merker was ever uncovered.[1]

1. According to the dockets of the Court of Common Pleas of Delaware County, (of which, with

counsel's consent, I take judicial notice), however, evidence of sexual misconduct was uncov-

Eventually, plaintiff was transferred out of Mr. Merker's homeroom, but he remained in two of Mr. Merker's classes and continued to receive detention from him. Plaintiff alleges that, between January, 1988, and March, 1988, Mr. Merker sexually assaulted him on at least three other occasions.

Plaintiff alleges that defendants' individual and collective failures to take action with respect to Mr. Merker, despite their knowledge as outlined above, amounted to (1) a practice, custom, or policy of deliberate or reckless indifference to the physical, verbal, and sexual abuse inflicted upon him and other students by Mr. Merker, and (2) a breach of their affirmative duty to protect students from harm inflicted by teachers. Plaintiff argues that these failures rise to the level of constitutional violations redressable under 42 U.S.C. § 1983.

Defendants move for summary judgment on the grounds that both of plaintiff's theories of relief are devoid of legal merit, and that, in any event, they are qualifiedly immune from liability for the actions and omissions alleged by plaintiff.

## DISCUSSION

### Summary Judgment Standard

■ Under Federal Rule of Civil Procedure 56(c), summary judgment is proper only if "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." The inquiry for the court is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby*, 477 U.S. 242, 251–52, 106 S.Ct. 2505, 2511–12, 91 L.Ed.2d 202 (1986). A party opposing summary judgment must marshal sufficient facts to show that there is a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). In this case, factual disputes abound. The question, however, is whether plaintiff, even if he proves his allegations to be completely true, would be entitled to redress under 42 U.S.C. § 1983.

### Practice, Custom, or Policy of Deliberate or Reckless Indifference

■ Plaintiff's first theory of relief is that defendants established a practice, custom, or policy of deliberate or reckless indifference to Mr. Merker's conduct and to plaintiff's constitutional rights. In *Monell v. Department of Social Servs.*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), the Supreme Court held that a municipality could be held liable for constitutional deprivations if the deprivations occur pursuant to a governmental custom, policy, or usage. Here, plaintiff has offered no direct evidence that the Southeast Delco School District adopted a formal policy which either condoned the type of abuse alleged here or discouraged reports of such abuse. Rather, plaintiff argues that the defendants' overall handling of Mr. Merker's behavior amounted to the adoption of a practice, custom, or policy of deliberate indifference to Mr. Merker's conduct and to plaintiff's and other students' constitutional rights.

In *Stoneking v. Bradford Area School Dist.*, 882 F.2d 720, 725 (3d Cir.1989), the Third Circuit held that the "[l]iability of municipal policymakers for policies or customs chosen or recklessly maintained is not dependent upon the existence of a 'special relationship' between the municipal officials and the

---

ered. In March, 1992, Mr. Merker was convicted of molesting six boys, four of whom had been special education students of his. In addition, in July, 1992, Dr. McKnight pleaded guilty to sexually assaulting four male students, three of whom were special education students. Finally, in October, 1991, Edward Hirst, a school bus driver for the Southeast Delco School District, was convicted of molesting two female special education students. Although perhaps not directly relevant to plaintiff's situation, these other incidents, es-

pecially the ones involving Mr. Merker, lend credibility to the testimony proffered by plaintiff that abuse of special education students by Mr. Merker was a substantial and oft-repeated problem. And, of course, Dr. McKnight's misconduct tends to demonstrate why he, and perhaps others, might have chosen to ignore the complaints about Mr. Merker. Mr. Hirst's convictions, in combination with the others, tend to show the depth of the sexual abuse problem with the school district's special education students.

individuals harmed."[2] In that case, a female student sued a school district and some school officials for injuries she incurred as a result of sexual abuse and harassment by her high school band director. The court declined to address the question of whether the defendants had an affirmative duty to protect students from their teachers, choosing instead to rest its decision on plaintiff's allegations that the defendants had adopted and maintained a practice, custom, or policy of reckless indifference to sexual abuse by teachers, and that they had concealed complaints of abuse and discouraged students from complaining about such conduct.

The court refused to enter summary judgment in favor of defendants, finding that plaintiff had produced sufficient evidence to create a material issue of fact about the existence of such a custom, practice, or policy. The evidence in *Stoneking* showed the following: the defendant school officials had received at least five complaints about sexual assaults on female students by teachers and staff members; records of such complaints were kept secret; the allegedly offending teachers were given excellent performance evaluations; school officials discouraged students and parents from pursuing complaints.

In the case at bar, while plaintiff alleges only one complaint by a student, he alleges that teachers and other staff members made repeated complaints to school officials about Mr. Merker's misconduct. The information communicated in those complaints may be reasonably viewed as having conveyed to school officials the message that Mr. Merker was a depraved and dangerous man. The complaints disclosed the sexual overtones of Mr. Merker's classroom comments and actions, the physical violence in which he reportedly engaged in class, his continued giving of late detention, his driving students home, and his contact with students after school hours. Further, school officials knew that Mr. Merker taught special education students, who might not fully understand the

inappropriateness of his actions, and who might be even more reluctant than mainstream students to report teacher misconduct, either because of their own insecurities, or because they might think that since only a small number of teachers taught special education students, little could be done to remove them from the offending teacher's classes. While the allegations made in this case are not identical to those made in *Stoneking*,[3] they are just as serious, and *Stoneking* clearly controls the outcome of the motion currently before the court.

The *Stoneking* court held that the plaintiff's "argument that there was no policy, custom, or practice is a merits issue ... If there are contested issues of material fact, they must go to the jury." *Stoneking*, 882 F.2d at 725. In light of what defendants allegedly knew about Mr. Merker's conduct, I find that a jury could reasonably conclude that the actions taken or not taken by defendants in response to reports of Mr. Merker's conduct amounted to a custom, practice, or policy of deliberate indifference to Mr. Merker's actions and to plaintiff's constitutional rights. I also find that a jury could reasonably conclude that this alleged custom, practice, or policy directly contributed to, led to, or caused plaintiff's injury, since the jury could find that, had defendants acted reasonably, plaintiff's injuries would not have occurred. *See, Bielevicz v. Dubinon*, 915 F.2d 845, 853–54 (3d Cir.1990). Therefore, I shall deny defendants' motions for summary judgment on plaintiff's first theory of relief.

Defendants assert that *Stoneking* is no longer good law and that its applicability has been or will be severely limited. But I find that *Stoneking* is still the law of this circuit, and that it has not been limited. In *Black by Black v. Indiana Area School Dist.*, 985 F.2d 707 (3d Cir.1993), decided January 29, 1993, the Third Circuit explicitly pointed to *Stoneking* as controlling authority on the question of whether the plaintiff had stated a

---

**2.** Although *Stoneking* was, in part, 2–1 decision, the court was unanimous in holding that custom-practice-or-policy is a theory of liability independent of the affirmative-duty theory discussed below. *See, Stoneking*, 882 F.2d at 731 (Stapleton, J., concurring in part and dissenting in part).

**3.** For example, the record appears to be silent on the performance evaluations, if any, given to Mr. Merker.

valid claim of a policy, practice, or custom of deliberate indifference on the part of the defendants. In *Black*, the court found that the plaintiff had not stated such a claim against a school superintendent, where the superintendent had taken immediate action against an assistant principal who had been the subject of sexual abuse complaints, contacted the parents of the alleged victims of sexual abuse by a bus driver, and launched investigations into the allegations. Further, to the extent that the superintendent's actions may have been insufficient, the court found that a rational trier of fact could not find that his conduct "contributed in some way" to the later conduct of the bus driver, who was not an employee of the school district. *Black*, 985 F.2d at 712–13.

The *Black* court held: "[i]n order to establish liability a plaintiff must demonstrate both that the defendant's policy, practice, or custom played an affirmative role in bringing about the sexual abuse and that the defendant acted with deliberate indifference to that abuse." *Id.* at 712. Here, I find that plaintiff has adequately alleged that defendants acted with deliberate indifference and that their actions and omissions played an affirmative role in bringing about plaintiff's injury. In addition, I find that the facts of this case are more similar to *Stoneking*, where, like here, the alleged abuser was a teacher employed by the school district, than to *Black*, where the alleged abuser was a bus driver not in the district's employ.

*Affirmative Duty to Protect*

Plaintiff's other theory of relief is that defendants failed in their affirmative duties to protect him from his teachers. In *DeShaney v. Winnebago County Dept. of Social Servs.*, 489 U.S. 189, 195, 109 S.Ct. 998, 1002, 103 L.Ed.2d 249 (1989), the Supreme Court held that the Due Process Clause of the Fourteenth Amendment

> is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security. It forbids the State itself to deprive individuals of life, liberty, or property without 'due process of law,' but its language cannot fairly be extended to impose an affirmative obligation on the State to ensure that those

interests do not come to harm through other means.

In *DeShaney*, the Court held that the defendant was not liable to the four-year-old plaintiff for injuries inflicted upon him by his father, even though the defendant agency, which had the power to remove plaintiff from the custody of his abusive father, repeatedly had been made aware that plaintiff's father was beating him. The Court held that, even if a state sets up an agency for the purpose of protecting people from one another, it still cannot be held liable under the Due Process Clause for injuries which nonetheless occur, because "the Due Process Clause does not require the State to provide its citizens with particular protective services." *DeShaney*, 489 U.S. at 196, 109 S.Ct. at 1003–04. This is because "a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *Id.* at 197, 109 S.Ct. at 1004.

The Court recognized an exception to this rule where a "special relationship" exists between the State and an individual. A "special relationship" exists "when the State takes a person into its custody and holds him there against his will." *Id.* at 199–200, 109 S.Ct. at 1005. In other words, the state does assume responsibility for the safety and general well-being of individuals in its custody, such as prisoners, *Estelle v. Gamble*, 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976), and involuntarily committed mental patients, *Youngberg v. Romeo*, 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982).

In *D.R. by L.R. v. Middle Bucks Area Vocational Technical School*, 972 F.2d 1364 (3d Cir.1992) (*en banc*), *cert. denied*, —— U.S. ——, 113 S.Ct. 1045, 122 L.Ed.2d 354 (1993), the Third Circuit held that a state does not have a "special relationship" with students in public schools. The court reasoned:

> By requiring D.R. to attend assigned classes at Middle Bucks as part of her high school educational program, and authorizing officials to engage in disciplinary control over the students, the school defendants did not restrict D.R.'s freedom to the extent that she was prevented from meeting her basic needs. . . . Thus, the school

defendants' authority over D.R. during the school day cannot be said to create the type of physical custody necessary to bring it within the special relationship noted in *DeShaney,* particularly when their channels for outside communication were not totally closed.

*D.R.,* 972 F.2d at 1372. In *D.R.,* two female students sued a public school and some school officials for physical and sexual abuse visited upon them by some male students. The alleged assaults took place during school hours in a unisex bathroom (which the alleged perpetrators locked from the inside) and a darkroom, both of which were part of a classroom. The court held that the defendants could not be held liable, because the state has no affirmative duty to protect students in public schools from each other.

In *Black,* the Third Circuit applied the reasoning of *D.R.* to a case in which it was alleged that a school bus driver, who was not an employee of the school district or the state, sexually molested female students on his bus. The court held that the school district and its superintendent could not be held liable because no "special relationship" existed between the school district and the plaintiffs. The court found insufficient state-imposed restraints on the plaintiffs' liberty, both because the plaintiffs' parents could have arranged for other means of transportation for their children, and because the plaintiffs had daily opportunities to seek help from their parents or others. *Black,* 985 F.2d at 714.

█ In this case, plaintiff argues that there were sufficient state-imposed restraints on his liberty to place defendants in a "special relationship" with him. Particularly, plaintiff points to Mr. Merker's "barricading" of the classroom door, plaintiff's frequent isolation in Mr. Merker's car, and the in-school detention imposed on plaintiff by Mr. Merker. However, I find that these alleged additional restraints are no more severe than the restraints at issue in *D.R.* and *Black.*

First, plaintiff admits that he sometimes skipped detention, tending to rebut the suggestion that the restraints were impermeable; beyond that, I do not find that the character of a student's attendance at detention is much different from attendance in classes. School rules require attendance in both classes and detention, both take place in classrooms, and neither involves overnight restraint or other types of significant restraint on students' liberty. Students have been known to cut classes, and apparently they have been known to also cut detention.

Second, as in *Black,* plaintiff's parents were free to arrange other transportation for their son, and apparently plaintiff voluntarily accepted rides from Mr. Merker. Under all the circumstances, the fullness of that voluntariness is obviously open to some question, in view of the psychological sway that such an authority figure as Mr. Merker could well have had on the young lad. But it does appear that plaintiff could have physically gotten out of Mr. Merker's car when other students were being dropped off or when the car was stopped.

Third, the references in the record to barricading are but sparse, and apparently the "barricading" referred to involved Mr. Merker's standing in the doorway to his classroom. In light of the *D.R.* court's holding that the locking of students in a bathroom imposes insufficient restraints on students' liberty to create a special relationship, I cannot find that a teacher's standing in a doorway exceeds that degree of incarceration in such a way as to make the alleged restraints at bar constitutionally significant.

Even taken together, the restraints alleged here are not the kind referred to by the Supreme Court in *DeShaney* and the Third Circuit in *D.R.* In order to create a "special relationship" with a person, the state must take the person into custody against his or her will, such that the person is rendered unable to care for himself or herself. The Third Circuit has found that temporary custody such as that at issue in this case is insufficient. Thus, I am constrained to conclude that the alleged restraints on plaintiff's liberty did not establish a "special relationship" between defendants and plaintiff.

Plaintiff makes another argument, one that this court regards as having more substance. He argues that this case is different from *DeShaney, D.R.,* and *Black* because, unlike

the plaintiffs in those cases, his injury was inflicted by a state actor. There is no question that Mr. Merker, as an employee of the Southeast Delco School District, was a state actor. And there is also no question that Mr. Merker's classroom conduct was within the scope of his state employment. Therefore, the question raised by plaintiff is whether, after *DeShaney*, a state has an affirmative duty to protect its citizens from its own employees. More specifically, the question at issue in this case is whether a state has an affirmative duty to protect students in public schools from their teachers.

This question was raised in *Stoneking*, but the Third Circuit chose not to decide it. As the court pointed out, "[t]he principal distinction between DeShaney's situation and that of Stoneking is that DeShaney's injuries resulted at the hands of a private actor, whereas Stoneking's resulted from the actions of a state employee." *Stoneking*, 882 F.2d at 724. The same distinction is true of the case at bar: plaintiff alleges that he was molested by a public school teacher, a state employee. The *Stoneking* court continued:

> [t]he significance of the status of the perpetrator as a private actor rather than as a state official is referred to on numerous occasions in the *DeShaney* opinion. Not only is the Court's statement of the holding in terms of the identity of the actor ('a State's failure to protect an individual *against private violence* simply does not constitute a violation of the Due Process Clause,' 109 S.Ct. at 1004), but the analytic steps taken by the Court to reach that holding continuously take note of the status of the person responsible for the injuries. *See, e.g.,* 'nothing in the language of the Due Process Clause itself requires the state to protect the life, liberty and property of its citizens *against invasion by private actors;*' the Due Process Clause 'forbids *the State itself* to deprive individuals of life, liberty or property without 'due process of law,' but its language cannot fairly be extended to impose an affirmative obligation on the State to insure that those interests do not come to harm *through other means;*' the purpose of the Due Process Clause 'was to protect the people *from the State*, not to insure that the State

protected them *from each other.'* [489 U.S. at 195] 109 S.Ct. at 1003.

*Stoneking*, 882 F.2d at 724 (quoting *DeShaney* ) (emphasis in *Stoneking* ).

In this case, as in *Stoneking*, the alleged perpetrator "was a school district employee subject to defendants' immediate control. In fact, many of [the alleged perpetrator]'s interactions with [the plaintiff] occurred in the course of his performance of his official responsibilities." *Stoneking*, 882 F.2d at 724. Despite distinguishing the case before it from *DeShaney*, the court said: "we choose not to rest our decision again on affirmative duty to protect such students in this situation because the uncertainty of the law in this respect may cause further delay." *Id.* The court went on to hold, as I have here, that even if the defendants had no affirmative duty to protect students from school employees, the plaintiff could still survive summary judgment on the custom-policy-or-practice theory.

After *Stoneking*, came *D.R.* and *Black*. In those cases, the Third Circuit held, as I have here, that a state does not have a custodial relationship with students in its public schools and that, therefore, the state has no affirmative duty to protect students from the misconduct of private actors such as other students and non-state employees such as bus drivers. The plaintiffs in *D.R.* advanced another theory of relief, namely that the state created the danger which eventuated in the plaintiffs' injuries. The court held that the plaintiffs could not prevail under the state-created-danger theory, in part because their "harm came about solely through the acts of private persons without the level of intermingling of state conduct with private violence that supported liability in" cases in which the state-created-danger theory was used. *D.R.*, 972 F.2d at 1375. Finally, the court held that *D.R.* lacked "the linchpin of *Stoneking II,* namely, a violation by state actors. Sexual molestation committed by an agent of the state is readily distinguishable from the situation present here." *Id.* at 1376.

Judge Seitz began the majority opinion in *D.R.* by observing: "[t]his appeal presents us

with a classic case of constitutional line drawing in a most excruciating factual context." *D.R.*, 972 F.2d at 1365. Given the *D.R.* court's distinction between misconduct by state actors and misconduct by private actors, and the lengthy discussion in *Stoneking* revealing the court's belief that *DeShaney* probably does not mean that states have no affirmative duty to protect their citizens from the misconduct of state employees acting within the scope of their employment, I find that the affirmative-duty line should be drawn at state action. That is, in light of *Stoneking* and *D.R.*, *DeShaney* stands only for the proposition that states have no affirmative duty to protect people from *private* actors, rather than the broader proposition that states have no duty to protect people from actors who are the state's own.

Most of the cases interpreting *DeShaney* have involved private actors or dangers not created by the state. Therefore, the courts, especially in school cases, have concentrated chiefly on an examination of the custodial or non-custodial nature of the state's relationship with the plaintiffs, rather than on the status of the alleged perpetrator. *See, e.g., D.R.; Black.* But the fact that most of the law in this area deals with custody does not mean that the custody determination is the only necessary inquiry under *DeShaney.*[4] I

find that the question of whether the alleged perpetrator is a state actor is equally determinative.

■■■ I believe that states do have an affirmative duty to protect students in public schools from abusive conduct by their teachers.[5] Public school teachers are state employees who are hired by, answerable to, and controllable by, school administrators, who are also state actors.[6] School districts must hire teachers. 24 P.S. § 11–1106. School districts may fire teachers for "immorality, incompetency, intemperance, cruelty, persistent negligence, mental derangement, ..." 24 P.S. § 11–1122. Teachers are to be rated for competency by the superintendent or, if the superintendent so directs, by an assistant superintendent, principal, or other supervisor. 24 P.S. § 11–1123. Thus, the school district—a state entity, and its administrators—state employees, are responsible for hiring, firing, monitoring, and evaluating teachers, who are also state employees.

A school district's affirmative duty to protect its students from their teachers derives from these responsibilities, none of which were present in *D.R.* or *Black*, since school districts have no such obligations to supervise students or private contractors. The

---

**4.** In a number of cases, courts have conditioned liability not upon the plaintiff's custodial circumstances, but upon state actions that themselves create or increase the underlying risk. *See, e.g., K.H. through Murphy v. Morgan*, 914 F.2d 846, 848–49 (7th Cir.1990); *Freeman v. Ferguson*, 911 F.2d 52, 54–55 (8th Cir.1990); *Wood v. Ostrander*, 879 F.2d 583, 589–90 (9th Cir.1989), *cert. denied*, 498 U.S. 938, 111 S.Ct. 341, 112 L.Ed.2d 305 (1990); *Cornelius v. Town of Highland Lake*, 880 F.2d 348, 357 (11th Cir.1989), *cert. denied*, 494 U.S. 1066, 110 S.Ct. 1784, 108 L.Ed.2d 785 (1990). *See also, Martinez v. California*, 444 U.S. 277, 285, 100 S.Ct. 553, 559, 62 L.Ed.2d 481 (1980). For an extensive discussion of what level of government involvement might trigger the right to an affirmative duty, *see, Pinder v. Commissioner of Cambridge*, 821 F.Supp. 376 (D.Md. 1993). The cases cited above discuss the level of government involvement necessary to trigger an affirmative duty to protect a person against private violence. I need not dwell on that subject because, in this case, plaintiff alleges that a state actor, acting within the scope of his state employment, directly harmed him. Clearly, such a charge alleges sufficiently direct state involvement.

**5.** In *J.O. v. Alton Community Unit School Dist. 11*, 909 F.2d 267 (7th Cir.1990), a school district and school officials were sued for a teacher's alleged sexual molestation of students. The Seventh Circuit held that the public school environment is not custodial, and it upheld the district court's dismissal of plaintiffs' affirmative-duty claim on that ground. However, the court did not address the question of whether the case before it was different from *DeShaney* because it involved a state perpetrator. The court did allow plaintiffs to amend their complaint to state a *Stoneking*-type claim. *See also, Doe v. Douglas County School Dist. RE–1*, 770 F.Supp. 591 (D.Colo.1991) (following *J.O.*). To the extent that these cases stand for the proposition that a state has no affirmative duty to protect students in public schools from their teachers, I respectfully disagree. As discussed above, I glean the clear inference from *Stoneking, D.R.*, and *Black*, that the Third Circuit Court of Appeals would not so hold.

**6.** In Pennsylvania, school districts are defined to be political subdivisions of the Commonwealth. 73 P.S. § 1886.

employer/employee relationship present in this case was not present in *D.R., Black,* or *DeShaney.* To hold that the state has no affirmative duty to protect people from its own employees would be a remarkable extension of the holdings of *DeShaney* and its progeny that the state has no affirmative duty to protect people from private actors. I believe that such an extension of *DeShaney* would be unwarranted, especially in light of the limiting language in *D.R., Black,* and *DeShaney* itself, and the instructive observations in *Stoneking.*[7]

*Qualified Immunity*

 Each individual defendant asserts that he is entitled to be dismissed from this suit under the doctrine of qualified immunity. In order to obtain qualified immunity, each defendant must show that his conduct did "not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982). The *Harlow* standard is an objective one. Defendants' subjective beliefs that they handled a situation properly are irrelevant. *Anderson v. Creighton,* 483 U.S. 635, 641, 107 S.Ct. 3034, 3040, 97 L.Ed.2d 523 (1987). Thus, a defendant is entitled to qualified immunity if a reasonable official in the defendant's position could have believed, in light of existing law, that his or her conduct comported with established legal standards. *Id.*

The Third Circuit has looked to "general, well-developed legal principles," *People of Three Mile Island v. Nuclear Regulatory Comm'n,* 747 F.2d 139, 144 (3d Cir.1984), in determining what constitutes "an established right of which a reasonable person would

have known." *Sourbeer v. Robinson,* 791 F.2d 1094, 1103 (3d Cir.1986), *cert. denied,* 483 U.S. 1032, 107 S.Ct. 3276, 97 L.Ed.2d 779 (1987). In order to place a defendant on notice of established rights, the factual situation of the particular case at bar need not be precisely analogous to those of previous cases, but some correspondence is necessary. *People of Three Mile Island,* 747 F.2d at 144.

In *Stoneking,* the Third Circuit held that "the constitutional right Stoneking alleges, to freedom from invasion of her personal security through sexual abuse, was well-established at the time the assaults upon her occurred." *Stoneking,* 882 F.2d at 726. In *Ingraham v. Wright,* 430 U.S. 651, 674, 97 S.Ct. 1401, 1414, 51 L.Ed.2d 711 (1977), a case about corporal punishment, the Supreme Court wrote: "where school authorities, acting under color of law, deliberately decide to punish a child by restraining the child and inflicting appreciable physical pain, we hold that Fourteenth Amendment liberty interests are implicated." In *United States ex rel. Caruso v. United States Board of Parole,* 570 F.2d 1150, 1157 (3d Cir.1978), *cert. denied,* 436 U.S. 911, 98 S.Ct. 2249, 56 L.Ed.2d 411 (1978), the Third Circuit held that "personal security from physical violence" is a protected liberty interest.

This combination of clearly established law, along with simple common sense, should make clear to any reasonable school official that the kind of conduct in which Mr. Merker is alleged to have engaged "could not possibly be deemed an acceptable practice." *Stoneking,* 882 F.2d at 727. Plaintiff's allegations clearly rise to the level of violations of clearly established constitutional rights.

---

**7.** Because I have also held that this case may proceed to trial on a *Stoneking* custom-practice-or-policy theory, this affirmative-duty holding may or may not have much practical significance. As far as I can tell, permitting this case to proceed on two theories of liability will not affect the evidence presented at trial. Presumably, the only effect of having the case proceed to trial on both theories of liability instead of just the custom-practice-or-policy theory will be in the arguments of counsel, the charge of the court, and the special interrogatories to the jury. The conduct at issue will be the same, and the alleged damages will be the same. It is likely

that the jury verdict form will be divided into three sections: one asking for a finding on the custom-practice-or-policy theory, one asking for a finding on the affirmative-duty theory, and one asking for an assessment of damages, if necessary. If the jury finds defendants liable on both theories, or not liable on either theory, or liable only on the custom-practice-or-policy theory, then this affirmative-duty holding will have had no effect. This holding will only make a difference at trial if the jury does not find a custom, practice, or policy, but does find a violation of the affirmative duty.

Having determined that plaintiff does allege a violation of his clearly established constitutional rights, the court must turn to an examination of the objective reasonableness of defendants' actions. The *Stoneking* court held that "the fact that Stoneking did not complain to the defendants about Wright's molestation of her is not dispositive.... [F]or qualified immunity purposes it is sufficient that there is adequate evidence that defendants were on notice of complaints of sexual harassment of students by teachers and staff at the school." *Id.* at 729.

The record in the case at bar contains adequate evidence upon which a jury could conclude that each of the defendants knew about Mr. Merker's sexually oriented and physically violent classroom behavior, and that each of them knew about his practice of giving late detention and personal rides home. The deposition testimony of the teachers and aides reveals repeated notice to all the defendants that those teachers and aides had grave concerns about Mr. Merker's behavior and the safety of his students.

If the jury does find that defendants were on notice of Mr. Merker's misconduct, then it could also reasonably find that defendants' actions and inaction were inadequate or unreasonable. Plaintiff alleges, in part, that defendants tried to keep Mr. Merker's behavior "quiet," failed to contact plaintiff's parents to report plaintiff's complaints, failed to confront Mr. Merker directly with reports of his misconduct, failed to reprimand Mr. Merker for his misconduct, failed to remove plaintiff from Mr. Merker's classes, and handled plaintiff's complaints ineffectively by having him interviewed by two strangers, neither of whom was an expert on child abuse or sexual abuse. Upon the record thus far developed in this case, I believe that a jury could reasonably find that, in light of clearly established law, defendants acted unreasonably in their handling of Mr. Merker

generally and plaintiff's situation in particular.

Defendants deny many of plaintiff's factual allegations and assert that their actions were reasonable. Defendants' assertions do raise important questions about the facts of this case and about the reasonableness of their actions. But those questions must be resolved by a jury. Plaintiff has marshaled sufficient evidence to defeat defendants' assertions of qualified immunity, as well as their substantive arguments for summary judgment.[8]

*Conclusion*

This case, like most in this area of the law, presents an appalling and tragic pattern of alleged facts. It also presents the court with an difficult line-drawing problem. It is the view of this writer that this is the case in which the continuing extension of *DeShaney* should and may, with intellectual integrity, be stopped. Drawing the affirmative-duty line at state action will not only provide courts with a bright-line test, but it is also fair. The Supreme Court and the Third Circuit have held that the state has no affirmative duty to protect people from harm visited upon them by private actors. But to extend that doctrine to hold that the state has no affirmative duty to protect people from its own employees, such as teachers, who have been placed in positions of great sensitivity and responsibility by the state itself, would be to go too far.

In addition, *Stoneking* remains good law in this circuit, and it provides plaintiff with an independent theory of relief, namely that defendants established a practice, custom, or policy of deliberate or reckless indifference to plaintiff's constitutional right of bodily integrity.

Finally, defendants are not entitled to qualified immunity, because the kind of abuse alleged by plaintiff is a violation of

---

**8.** There is one exception. As plaintiff's counsel conceded at oral argument, the only evidence of record that defendant Bruce B. Morgan knew about Mr. Merker's behavior is Ms. Ashbridge's statement that Ms. Pennestri told her that she had described Mr. Merker's behavior to Mr. Morgan. Ms. Pennestri is now deceased, and the hearsay rule will prohibit Ms. Ashbridge from repeating at trial the statements made by Ms. Pennestri to her. Thus, plaintiff has not produced any admissible evidence showing that Mr. Morgan had notice of Mr. Merker's misconduct. Therefore, he is entitled to qualified immunity, and summary judgment shall be entered in his favor.

clearly established constitutional rights, and because plaintiff makes sufficient allegations that defendants were on notice of Mr. Merker's misconduct and responded inadequately or unreasonably.

An Order follows.

## ORDER

AND NOW, this 29th day of June, 1993, upon consideration of defendants' motions for summary judgment, plaintiff's response thereto, and defendants' respective replies, and after argument in open court, the motion for summary judgment of defendant Bruce B. Morgan is GRANTED, and the motions for summary judgment of all other defendants are DENIED.