**K.L., Plaintiff,**

**v.**

**SOUTHEAST DELCO SCHOOL DISTRICT, William C. Donato, Bruce B. Morgan, Lancess T. McKnight, Paul Sanborn, Ralph E. Sorrell, Eugene DePaul, and Thomas Schellinger, Defendants.**

**Civ. A. No. 92–1541.**

United States District Court,
E.D. Pennsylvania.

July 27, 1993.

Joseph M. Fioravanti, Curran Winning & Fioravanti, P.C., Media, PA, for plaintiff.

Louis A. Bove, Swartz, Campbell & Detweiler, Philadelphia, PA, Jeffrey P. Hoyle, William F. Holsten, II, Holsten & White, Media, PA, Joseph T. Bodell, Jr., Swartz, Campbell & Detweiler, John M. Donahue, Harris and Silverman, Philadelphia, PA, Andrew L. Braunfeld, Erika A. Spott, Masterson, Braunfeld, Himsworth & Maguire, Norristown, PA, for defendants.

### OPINION

GAWTHROP, District Judge.

In this case, plaintiff seeks to recover under 42 U.S.C. § 1983 for damages he allegedly incurred as a result of alleged sexual, physical, and verbal abuse by Robert Merker, one of his teachers at Ashland Middle School in the Southeast Delco School District. Presently before the court are the motions for summary judgment of all defendants. This case and this opinion are related to *C.M. v. Southeast Delco School Dist.*, Civ. A. No. 91–3795, 1993 WL 257326 (E.D.Pa. June 29, 1993). While the two cases have different plaintiffs, the defendants are the same, as are all the lawyers who have briefed and argued the cases. On June 29, 1993, this court issued an opinion denying the motions for summary judgment of the defendants in *C.M.* Most of the arguments raised by defendants in this case were addressed in that opinion. I shall not revisit those arguments here, except further to explain certain portions of the *C.M.* opinion. Using the same reasoning as in *C.M.*, I shall deny all the motions for summary judgment except that of defendant Bruce B. Morgan, whose motion shall be granted.

Defendants do make one argument in this case which was not present in *C.M.*: they argue that they may not be held responsible for injuries allegedly incurred by plaintiff during the course of a two-and-a-half-year sexual relationship between himself and Mr. Merker. Because that relationship occurred after plaintiff graduated from Ashland Middle School, and because defendants had insufficient notice of the relationship, I hold that defendants may not be held liable for any injuries which plaintiff incurred as a result of the relationship. Therefore, summary judgment shall be entered in favor of all defendants with respect to that part of plaintiff's case.

### BACKGROUND

During the 1987–88 school year, plaintiff was a special education student in Mr. Merker's eighth-grade class. Plaintiff alleges that during the school year, Mr. Merker subjected him to sexual, physical, and verbal abuse and harassment, and that the school district and the individual defendants, all school administrators, knew or should have known about Mr. Merker's offensive and abusive conduct with respect to plaintiff and other students and former students. Plaintiff alleges that the school district and the individual defendants adopted and maintained a practice, custom, or policy of deliberate or reckless indifference to Mr. Merker's conduct, and that they failed in their affirmative duties to provide for the safety and well-being of their students.

In *C.M.*, I set out the plaintiff's allegations with respect to Mr. Merker's classroom and extracurricular conduct, defendants' knowledge thereof, and defendants' actions and omissions. Plaintiff here, a classmate of C.M., makes very similar allegations. They need not be restated at length. In particular, plaintiff alleges that, during class, Mr. Merker often touched him on his "backside" and thighs, punched him, slapped him on the back of the neck, pushed him against lockers, tripped him, placed him in headlocks, hugged him, and applied the "Vulcan Death Grip" to him. Plaintiff also alleges that Mr. Merker referred to him as "Zed," equating him with a character in the movie "Police Academy" who, like plaintiff, had a speech impediment. Mr. Merker also allegedly told plaintiff that his mother was promiscuous, that his parents did not love him, and that he should come and live with Mr. Merker instead of them. In addition, Mr. Merker allegedly gave plaintiff detention three or four times per week, often keeping him too late to catch the late bus home. On those occasions, Mr. Merker would drive plaintiff home personally. One time, he allegedly touched plaintiff's crotch.

In addition, plaintiff alleges the following: on the last day of the 1987–88 school year, Mr. Merker awarded him a perfect score on his final exam. Mr. Merker then left school early and spent the afternoon with plaintiff. He bought plaintiff a banana split and drove him around in his van for a while, eventually taking him home. After arriving at plaintiff's house, Mr. Merker, plaintiff's mother, and plaintiff's stepfather discussed a summer job for plaintiff. They agreed that Mr. Merker would hire plaintiff to help him with his job, cleaning automated bank teller machines. Within a week, plaintiff began working for Mr. Merker. In August, 1988, plaintiff's relationship with Mr. Merker took on a sexual character. Plaintiff engaged in sexual activity with Mr. Merker in exchange for money, drugs, and other items. Both the work and sexual relationships continued until

the spring of 1991, when Mr. Merker was arrested and charged with sexually assaulting young boys.[1] During the entire period of the relationship, Mr. Merker remained a teacher at Ashland Middle School, and plaintiff was a student at Academy Park High School, also in the Southeast Delco School District.

### DISCUSSION

*Practice, Custom, or Policy of Deliberate or Reckless Indifference*

■ At least as to this theory of relief, this case is controlled by *Stoneking v. Bradford Area School Dist.*, 882 F.2d 720 (3d Cir.1989). Using the same reasoning as in *C.M.*, I find that plaintiff has alleged sufficient injury and sufficient notice to, and actions and inaction by, the various defendants, to survive defendants' motion for summary judgment.

I do wish, however, to make one thing clear and to deflect a suggestion made at oral argument in this case, which took place shortly after *C.M.* came down:[2] neither this holding nor that one is based on the theory that defendants are somehow liable under *respondeat superior.* The court well recognizes that under *Monell v. Department of Social Servs.*, 436 U.S. 658, 691, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978), defendants in actions brought under 42 U.S.C. § 1983 may not be held liable under such a theory, and I never intended to suggest otherwise. I did not think that I had. And I certainly shall not suggest it when I charge the jury or juries in these cases. I shall make clear that defendants may not be held liable merely for employing Mr. Merker, but only for their own unconstitutional actions and failures to act. The allegations in these cases adequately accuse defendants, through their own actions and omissions, of adopting a practice, custom, or policy of deliberate indifference to the plaintiffs' constitutional rights by unreasonably and unconstitutionally dealing with Mr. Merker's abusive and offensive conduct.

1. In March, 1992, he was convicted of these charges.

2. This timing happened rather coincidentally, but in retrospect the court considers itself privileged to have had the benefit of these additional, very

able arguments, made in light of the then-very-recent *C.M.* opinion, as well as fortunate to have the opportunity to seek to dispel any confusion or misapprehension my choice of words in *C.M.* may have sown.

Decisions on the truthfulness of these allegations, and on each defendant's individual liability or nonliability, must be made by a jury.

Plaintiff in this case, as well as in *C.M.*, has alleged, and has pointed to adequate supporting proof in the record, that (1) Mr. Merker engaged in a continuing, widespread, persistent pattern of unconstitutional misconduct, (2) defendants were deliberately indifferent to or tacitly authorized this conduct after they were notified of the conduct, and (3) the deliberate indifference or tacit authorization directly led to his injuries. Therefore, he has stated a proper claim for relief under *Monell.*

*Affirmative Duty to Protect*

■ In *C.M.*, I examined the Supreme Court's opinion in *DeShaney v. Winnebago County Dept. of Social Servs.*, 489 U.S. 189, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989), and the Third Circuit's opinions in *D.R. by L.R. v. Middle Bucks Area Vocational Technical School,* 972 F.2d 1364 (3d Cir.1992) (*en banc* ), *cert. denied,* —— U.S. ——, 113 S.Ct. 1045, 122 L.Ed.2d 354 (1993), and *Black by Black v. Indiana Area School Dist.,* 985 F.2d 707 (3d Cir.1993), finding that those cases, together with *Stoneking,* stand for the proposition that states have no affirmative duty to protect people from private actors. I further found that those cases do not stand for the additional proposition that states have no duty to protect people from state actors.

The discussion of custody in *C.M.* is applicable to this case as well. In light of *D.R.* and *Black,* I am constrained to conclude, as I did in *C.M.*, that the alleged restraints on plaintiff's liberty in this case did not place plaintiff sufficiently in the custody of the state as to establish a "special relationship" between defendants and plaintiff.

Further, I reiterate the observation in *C.M.* that the custody determination is not the only inquiry under *DeShaney*. There, I found that the question of whether the alleged perpetrator is a state actor is equally determinative, and I make that finding here as well.

■ Ultimately, I held in *C.M.* that states do have an affirmative duty to protect students in public schools from abusive conduct by their teachers, postulating that the Third Circuit would so hold.[3] I stand by and follow that holding here, but I write to expand a bit on the reasoning in *C.M.* and to make explicit some things which were left implicit in that opinion.

First, the holding of *C.M.* is that public school districts and school officials have an affirmative duty to protect students from state-employed teachers. Although defendants point to language in the opinion which, when taken out of context, might seem to stand for the more sweeping proposition that the state has an affirmative duty to protect citizens from *all* state employees, that is not the holding of the case. The generic "state actor vs. private actor" discussion was merely intended to show that there is a difference between harm caused by a teacher and harm caused by other students, as in *D.R.*, or by other private actors such as the bus driver in *Black*. In addition, I found that school districts and school officials have heightened supervision and monitoring responsibilities over teachers, as well as responsibilities to look after students. Given these factors, as well as the great sensitivity of a teacher's job, I held only that school districts and school officials do have an affirmative duty to protect students from teachers. Nor could I licitly have held anything more. Since I work in the judiciary, rather than the legisla-

---

**3.** I note that the Fifth Circuit, in a case brought by a female student against a school district, a school principal, and a superintendent, held that the student "had a firmly established constitutional right under the due process and equal protection clauses of the Fourteenth Amendment to be free from sexual molestation by a state-employed schoolteacher, [and] that the superintendent and principal had an affirmative, constitutionally-based duty to protect her from such an intrusion into her bodily integrity." *Jane Doe v. Taylor Independent School Dist.,* 975 F.2d 137,

138 (5th Cir.1992), *cert. denied,* —— U.S. ——, . 113 S.Ct. 1066, 122 L.Ed.2d 371 (1993), *rehearing en banc granted,* 987 F.2d 231 (1993). The Fifth Circuit found that the school and its officials had an affirmative duty to protect students because students are in the "functional custody" of school officials, a position which the Third Circuit rejected in *D.R.* Nonetheless, the bottom line in *Jane Doe* is consistent with the bottom line in *C.M.,* even though the reasoning is, admittedly, different.

ture, when I decide a case, I do so by applying the law as I see it to the facts as I find them—or as posited by the pleadings at a particular procedural juncture, resulting in a holding. The facts of this case and *C.M.* unambiguously involve a public school teacher, rather than, for example, a state forester. Thus, the cases' holdings go no further than that. The term "state actor" in the § 1983 context is a term of art, used merely to distinguish such an actor from a private employee. I certainly did not intend to say otherwise, and upon re-reading *C.M.*, I certainly did not say otherwise.

I did not in *C.M.*, nor do I here, express any opinion as to whether the state might have an affirmative duty to protect students from, for example, school janitors or cafeteria workers, or whether the state might have an affirmative duty to protect citizens from police officers, trash collectors, or any other state employees outside the public school system. The holding is limited to teachers, whom the state has placed in sensitive positions involving close, daily contact with children, and over whom school administrators have direct supervisory authority.

Second, although in *C.M.* I referred to state statutes which require school districts and school administrators to hire, fire, monitor, and evaluate teachers, I did not find that the affirmative duty arises solely from these statutes. In order for there to be a cause of action under 42 U.S.C. § 1983, the plaintiff must allege a federal constitutional or statutory violation. The responsibilities of school districts and school officials to insure the safety of their students from their teachers would exist regardless of state statutes and school rules. These responsibilities arise out of the students' rights under the Fourteenth Amendment to be free from invasion into their physical integrity by state actors. While the state statutes make these duties more explicit, they do not create them; the Constitution does.

It may well be, as defense counsel asserted at oral argument, that the affirmative-duty inquiry is not needed when the alleged harm is caused by state actors, because in such cases plaintiffs may recover under the custom-practice-or-policy theory. In other words, when the harm is visited by a private actor, affirmative duty would be the theory of recovery; where the harm is visited by a state actor, custom-practice-or-policy would be the theory of recovery.[4] Indeed, in footnote 7 of the *C.M.* opinion, I noted that the affirmative-duty holding might have little practical significance in the ultimate resolution of the case. Under the circumstances of this case and *C.M.*, I have found that the plaintiffs may proceed under both theories of liability. If more than one theory of liability fits plaintiff's case, it is not for me to force plaintiff, pre-trial, to empty his quiver of all but one. He has a right to have his case submitted to the jury on all feasible theories. Further, it is not really for defense counsel to say what theories they think plaintiff's counsel needs, any more than it is for plaintiff's counsel to say the same about defendants' arsenal of legal defenses.

*Qualified Immunity*

■ In *C.M.*, I relied on *Stoneking* in holding that the defendants were not entitled to qualified immunity. I found that the plaintiff had alleged a violation of clearly established constitutional rights,[5] and that, in

---

4. In addition, defendants argue that the "state-created danger" theory, upon which *C.M.* is partially based, can only hold the state liable for failing to protect people from injuries caused by private actors. While it is true that most of the "state-created danger" cases involve harm visited by private actors, I see no reason why such a theory cannot be used to recover when the harm is visited by a state actor. That this theory has not yet been used does not mean that it cannot ever be used. It may be that the custom-practice-or-policy theory will be the only theory of relief permitted in these situations, but that is for the Courts of Appeal and Supreme Court to decide.

5. Defendants make much of plaintiff's deposition testimony that he and, apparently, other students viewed Mr. Merker's in-class physical contact with students as "normal." However, conduct does not become constitutional merely because it is viewed by the victim, at the time, as "normal." Nor does conduct become constitutional merely because it is repeated so many times that it comes to be considered "normal." If anything, the fact that students viewed Mr. Merker's conduct as normal lends credence to plaintiff's argument that defendants had a practice, custom, or policy of deliberate indifference toward that conduct, because Mr. Merker's classroom conduct was certainly not "normal."

light of the notice each defendant was allegedly given, a jury could find that defendants' actions and inaction violated those constitutional rights. With the exception of the allegation here of the out-of-school relationship, the allegations of harm, notice, action and inaction by defendants in this case are identical to those in *C.M.* Therefore, I find that defendants also are not entitled to qualified immunity here.[6]

As for the requirement of an "affirmative link" between defendants' actions and inaction and plaintiffs' injuries, the *Stoneking* court held that toleration, condonation, or encouragement of unconstitutional behavior by a teacher could be enough to establish an "affirmative link." *Stoneking,* 882 F.2d at 730–31. Here and in *C.M.,* plaintiffs do not allege that defendants actively encouraged Mr. Merker to abuse his students, but they do allege that defendants tolerated and tacitly condoned his behavior. Plaintiffs have pointed to sufficient evidence in the record to support this proposition. Therefore, I find that plaintiffs have "asserted a sufficiently tenable theory that there was an 'affirmative link' between [their injuries] and the policies and practices that [defendants] employed and affirmative acts they took in furtherance of them to make this a jury issue." *Stoneking,* 882 F.2d at 731.

On the issue of when the constitutional rights became clearly established, the *Stoneking* court held that the right to freedom from invasion of one's personal security through sexual abuse was well-established at the time the assaults at issue there allegedly occurred, 1980 through 1985. *Stoneking,* 882 F.2d at 726. In 1977, the Supreme Court observed that corporal punishment could implicate Fourteenth Amendment liberty interests. *Ingraham v. Wright,* 430 U.S. 651, 674, 97 S.Ct. 1401, 1414, 51 L.Ed.2d 711 (1977). In 1978, the Third Circuit held that "personal security from physical violence" is a protected liberty interest. *United States ex rel. Caruso v. United States Board of Parole,* 570 F.2d 1150, 1157 (3d Cir.1978), *cert. denied,* 436 U.S. 911, 98 S.Ct. 2249, 56 L.Ed.2d 411 (1978). The alleged constitutional violations in this case and in *C.M.* occurred from 1987 through 1991, after the alleged violations in *Stoneking* and well after *Ingraham* and *Caruso.* If the rights were clearly established by the late 1970's or early 1980's, as those cases held, then obviously they were clearly established by 1987.

Defendants argue that *C.M.* "created" an affirmative duty on the part of school administrators to protect students from teachers, and that, therefore, they were not, and could not have been, aware of such a duty at the time the alleged action in this case occurred. It is true that before *C.M.* no court in this circuit had held that an affirmative duty to protect students from teachers exists, but no court has been confronted with the question.[7]

---

In addition, it does not matter whether plaintiff viewed the conduct as offensive or harmful at the time. That plaintiff did not realize that Mr. Merker's conduct was injurious to him, and that he did not complain about it to anyone, until later does not preclude him from recovering under § 1983.

It was also argued that certain of plaintiff's deposition testimony should not be taken at full verbal value. Indeed, that testimony may well bespeak an adolescent plaintiff who, having found himself discovered in a mortifyingly embarrassing scenario, seeks to handle the situation not with straightforward, quiet piety, but rather with a display of sarcastic bluster and bravado. It is difficult to discern from the cold page, devoid of facial and body language and bereft of inflection, what the true meaning of all his words really is. But at this stage of the proceedings, the court must view the record in the light most favorable to plaintiff. Looking at the whole record, I find that defendants have not met their burden of proving that they are entitled to qualified immunity.

**6.** Some of the qualified immunity section of *C.M.* is phrased, perhaps unartfully, in terms of "reasonableness." By using such terminology, I did not purport to employ a negligence standard for qualified immunity. Entitlement to qualified immunity is not based on whether a particular act of a defendant was or was not merely reasonable. Rather, the question is whether any reasonable official in the defendant's position could have believed his or her action or inaction to comport with established legal standards. In both *C.M.* and here, I find that, if plaintiffs' allegations of Mr. Merker's actions and defendants' knowledge thereof turn out to be true, a jury could find that no reasonable officials in defendants' positions could have believed that their actions or inaction comported with established constitutional standards.

**7.** In *Jane Doe v. Taylor Independent School Dist.,* 975 F.2d 137 (5th Cir.1992), decided October 2, 1992, the Fifth Circuit held that an affirmative duty to protect students from teachers existed at

Nonetheless, the rights protected by the affirmative duty are rights which, as outlined above and in *C.M.*, were clearly established by the time during which the alleged violations here occurred. I do not believe that school administrators would be surprised to find out that they have a duty to protect students from teachers. *C.M.* did not create new constitutionally protected rights; at most, it permitted already clearly established rights to be vindicated under a different theory. Therefore, defendants are not entitled to qualified immunity on that theory of relief.[8]

*The Alleged Out-of-School Relationship*

■ The existence of state action is crucial to both the custom-practice-or-policy theory of relief (under *Monell* and *Stoneking*) and the affirmative-duty theory of relief (under *C.M.*). Plaintiff's allegation of an out-of-school sexual relationship with Mr. Merker raises two important questions. First, was Mr. Merker a state actor during the course of the alleged relationship? I.e. can his actions be attributed to the state? Second, could or should defendants have done anything to prevent or stop the relationship? Because I answer both questions in the negative, I shall enter summary judgment in favor of defendants with respect to this part of plaintiff's case.

Plaintiff finished the eighth grade in June, 1988, thereby finishing his career at Ashland Middle School and his teacher-student relationship with Mr. Merker. Within a week, plaintiff began to work for Mr. Merker cleaning automatic bank teller machines. Plaintiff and Mr. Merker allegedly began their sexual relationship began in August, 1988. The relationship allegedly lasted until March, 1991. Apparently, plaintiff continued working for Mr. Merker throughout this period.

Plaintiff asserts that defendants are liable for the injuries he sustained during the entire length of his relationship with Mr. Merker. He postulates that had defendants fulfilled their duties to protect him from Mr.

Merker in school, rather than being indifferent, the sexual relationship would never have happened. This argument stretches "causal connection" a bit too far.

Mr. Merker was not engaging in state action during his alleged out-of-school relationship with plaintiff. The alleged sexual relationship began approximately three months after plaintiff stopped being one of Mr. Merker's students. For those three months, and throughout the length of the relationship, plaintiff was an employee of Mr. Merker in a business wholly unrelated to the Southeast Delco School District. The only connections between Mr. Merker's state actions and the sexual relationship with plaintiff are (1) Mr. Merker knew plaintiff because plaintiff was one of his students, and (2) he offered plaintiff the job, with plaintiff's parents' approval, on the last day of classes for the 1987–88 school year, after rewarding him with a banana split for doing well on his final exam.

Plaintiff acknowledges that his relationship with Mr. Merker took on a drastically different character during his tenure as Mr. Merker's employee. Plaintiff makes no allegations that he engaged in fellatio, masturbation, or voyeurism with Mr. Merker until at least two months after the teacher-student relationship ended. When these acts occurred, Mr. Merker was his boss and perhaps his friend, but not his teacher. Because Mr. Merker was not acting as a teacher and was not representing the school district, he was not a state actor.

Mr. Merker's alleged in-class beatings and touching of plaintiff were clearly state actions. Any abuse which occurred in Mr. Merker's van while giving plaintiff rides home were also state actions, since Mr. Merker, acting as a teacher, gave plaintiff late detentions so that plaintiff would have to accept rides home from him. But the later relationship, even though it may have started because plaintiff was a student in Mr. Merker's class, arose much more directly out of Mr. Merker's summer employment of plaintiff, which had nothing to do with Mr. Merk-

least as early as 1986, when the alleged violations in that case occurred.

8. I assure defendants that I shall instruct the jury that, if they find that defendants did not know,

and should not have known, that they had an affirmative duty to protect students from teachers, then the jury must find for defendants on that theory of relief.

er's job as a teacher. While it is true that plaintiff may have been vulnerable to intimidation by Mr. Merker, his vulnerability was not so much related to Mr. Merker's status as a teacher as to his status as plaintiff's boss and because he could threaten to expose plaintiff as a homosexual. For all of these reasons, I find that Mr. Merker's out-of-school sexual relationship with plaintiff did not involve state action. Therefore, under *Monell,* there is no basis for recovery under a custom-practice-or-policy theory. As to the affirmative-duty theory, absent state action, this case is controlled by *DeShaney, D.R.,* and *Black.* The fact that the relationship may have been made possible because Mr. Merker was once plaintiff's teacher does not transform the relationship into one involving state action.

Even if Mr. Merker were deemed to be a state actor during the relationship, defendants still could not be held liable. I do not believe that a school district's or school official's affirmative duty to protect students from their teachers extends to an out-of-school, post-graduation relationship such as this one. If the sexual relationship had begun while plaintiff was still a student in Mr. Merker's class, the situation might be different.[9] But to impose an affirmative duty on school districts and school officials to protect every student who has ever been a student in their schools from every teacher they have ever employed would be to go too far.[10]

In addition, plaintiff told no one, including his parents and school officials, about the relationship. The record does not indicate that defendants had notice of Mr. Merker's relationship with plaintiff or any other sexual relationship he may have had with former students. To hold that they could have adopted a custom, practice, or policy of deliberate indifference toward such relationships, when they had no reason to know that such relationships existed, also would be to go too far.

Finally, it is doubtful whether, even if defendants knew of the relationship, they had any power to stop it. I am aware of no authority which gives school officials the right to intervene in the out-of-school lives of teachers. Even if defendants had taken action[11] to prevent Mr. Merker's offensive behavior in class and on rides home, such action would not necessarily have prevented the later relationship, which derived from Mr. Merker's and plaintiff's employer-employee contact.

*Conclusion*

For the reasons set out above and in my opinion in *C.M.,* I shall deny defendants' motions for summary judgment with respect to the alleged actions which occurred at school or on the way home from school.[12]

However, because I find that (1) defendant's affirmative duty to protect plaintiff

---

9. For example, in *Stoneking* the alleged relationship between a high school band director and the plaintiff began while the plaintiff was a student and continued after she graduated. The Third Circuit did not explicitly address the question of whether the school district and school officials could be held liable for damages incurred by the plaintiff during the part of the relationship which occurred after her graduation. However, even if the *Stoneking* court had held that the defendants could be liable for the plaintiff's post-graduation injuries, such a decision, by itself, would not control this case, since here the sexual relationship did not even *begin* until after plaintiff graduated from the eighth grade.

10. I realize, of course, that Mr. Merker remained a teacher at Ashland Middle School and that plaintiff remained a student in the Southeast Delco School District throughout the relationship. But this does not change the analysis. The basis of plaintiff's argument would be the same even if he had transferred to a different

school district or if Mr. Merker had left his job at Southeast Delco. Essentially, plaintiff argues that Mr. Merker's out-of-school relationship with him should be attributed to the school district because of his *prior* contact with plaintiff in class and because of the school district's *prior* notice of Mr. Merker's offensive in-class behavior. For purposes of this argument, it does not matter whether Mr. Merker or plaintiff remained in the school district, since, according to the argument, defendants' violations occurred while plaintiff was in Mr. Merker's class.

11. By this I mean action less severe than outright dismissal, such as the imposition and enforcement of strict rules, constant monitoring, or threats of disciplinary action.

12. As in *C.M.,* I shall grant the motion for summary judgment of defendant, Bruce B. Morgan, because of the lack of admissible evidence tending to show that he had notice of Mr. Merker's alleged misconduct.

from Mr. Merker did not extend to the later, out-of-school relationship, (2) Mr. Merker was not a state actor during that relationship, (3) plaintiff has not produced sufficient evidence tending to show that defendants had enough notice of this or other relationships to have adopted a custom, practice, or policy of deliberate indifference toward out-of-school relationships between teachers and students, and (4) defendants were not required to, nor could they have, prevented the relationship, I shall grant defendants' motions for summary judgment with respect to the relationship.