Connie M. SHEPARD, Brian F. Shepard, Michael Shepard, Brian L. Shepard and Bradley J. Shepard, Plaintiffs,

v.

David KEMP, Lawrence Henry, the Oswayo Valley School District, the Oswayo Valley School Board and Chris Mattie, Defendants.

Civil No. 93–1596.

United States District Court, M.D. Pennsylvania.

Dec. 29, 1995.

---

James Thomas Rague, III, Wellsboro, PA, for David Kemp.

Richard G. Fine, Edward A. Monsky, Fine Wyatt & Carey, Scranton, PA, for Lawrence Henry, Oswayo Valley School District.

### MEMORANDUM AND ORDER

NEALON, District Judge.

In this action, Connie M. Shepard and Brian F. Shepard, as parents, and their sons, Michael Shepard, Brian L. Shepard and Bradley J. Shepard, seek to recover damages from David Kemp, Lawrence Henry and the Oswayo Valley School District [1]. Jurisdiction is predicated on 42 U.S.C. § 1983 by the parents based on the allegation that all defendants interfered with, and adversely affected, family relations between parents and children, and by the sons, as individuals, against the same defendants for religious, sexual and family abuse. Pendent state law claims of assault and civil conspiracy have also been filed. In this Memorandum, the motions for summary judgment of defendants Lawrence Henry and the Oswayo Valley School District will be addressed. The motions have been fully briefed and are now ripe for determination. For the reasons that follow, the motions will be granted.

### Factual Background

The record in the instant case consists of deposition testimony, affidavits and defendants' Statement of Material Facts. The evidence will be viewed in a manner most favorable to plaintiffs together with the uncontested affidavits and the unchallenged portions of the Statement of Material Facts submitted by the defendants [2]. The following factual scenario emerges:

Don Bailey, Steven W. Alm, Old English Gap, Harrisburg, PA, for plaintiffs.

1. The Oswayo Valley School Board and Chris Mattie were originally joined as defendants but were dismissed from the action by plaintiffs.

2. Local·Rule 7.4 provides:

"Upon any motion for summary judgment pursuant to Fed.R.Civ.P. 56, there shall be filed with the motion a separate, short and concise statement of the material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried.

The papers opposing a motion for summary judgment shall include a separate, short and concise statement of the material facts, responding to the numbered paragraphs set forth in the statement required in the foregoing paragraph, as to which it is contended that there exists a genuine issue to be tried.

All material facts set forth in the statement required to be served by the moving party will be deemed to be admitted unless controverted by the statement required to be served by the opposing party."

Connie Shepard (Mrs. Shepard) and Brian F. Shepard (Mr. Shepard) are the parents of Michael Shepard (Michael), born May 1, 1973 and twin brothers Brian L. Shepard (Brian) and Bradley J. Shepard (Bradley), born November 8, 1974. Michael was graduated from Oswayo Valley High School in June, 1991, and the twins were graduated in June, 1993. Defendant, David Kemp (Kemp), was a school teacher at the Oswayo School and a Christian Minister, and defendant, Larry Henry (Henry), was School Superintendent. Dale Ishman (Ishman) served as Principal of the High School, Michael Ackerman (Ackerman) was the High School Guidance Counselor, and Henry Wojochowski (Wojochowski) was acting Principal until August, 1992. Kemp is charged by the children with committing sexual assault, religious proselytizing and family abuse while he is accused by the parents of interfering with family relations.[3] Henry and the School District are accused of creating a policy, practice, or custom which played an affirmative role in bringing the unconstitutional abuses against the plaintiffs and acting with deliberate indifference to that abuse.

The relationship between Michael and Kemp began while Michael was in his sophomore year at the Oswayo Valley High School. Michael was in Kemp's constitutional law class where he was singled out by Kemp for lengthy one-on-one discussions of various issues including religion. There were no allegations of any physical contact between Kemp and Michael during the sophomore year.

Michael did not attend any classes at the Oswayo Valley High School during his junior or senior years. His junior year (1989–1990) was spent at the Page School in Washington, D.C., and his senior year (1990–1991) at Clarkson University in Potsdam, NY. Michael graduated from the Oswayo Valley High School in June of 1991.

During breaks from Page School, Michael would visit Kemp and they corresponded by writing. Kemp's letters to Michael would often discuss religion pursuant to the religious dialogue that began in the constitutional law class. They continued to correspond while Michael was at Clarkson College. On May 1, 1991, Michael attained age eighteen. Shortly before Michael's High School commencement in June, 1991, Michael asked Kemp for a letter of recommendation which Kemp later provided; they also had several discussions regarding religion during that time. On August 13, 1991, after graduating, Michael was baptized by Kemp. This was done at Michael's request. On the day of the baptism, Kemp hugged Michael a few times, these were normal hugs, however, not "prayer hugs."[4] The day of the baptism was the first time that Kemp ever hugged Michael. After the baptism Michael was required by Kemp to do thorough religious study. This is where the objectionable prayer hugs occurred. During one visit to Michael's dorm room in Washington, D.C. in March of 1992 Kemp exposed himself to Michael. For a period of time during the summer of 1992 Micheal moved into Kemp's house.

Bradley and Brian Shepard entered their senior year at Oswayo Valley High School in the fall of 1992 and were graduated from there on June 5, 1993.

Brian, at his own request, was baptized by Kemp on March 22, 1992. Prior to his baptism, and for a period thereafter, Brian received religious instruction from Kemp which included prayer hugs. These sessions were conducted in Kemp's classroom. Brian became uncomfortable with the prayer hugs and the religious training and hugs ceased in April of 1992.[5]

---

3. The sexual abuse complained of consisted of Kemp rubbing the backs and necks of the boys, and other such touching, and administering "prayer hugs". During these "prayer hugs", Kemp allegedly would pray with the boys while hugging them and rubbing up against them occasionally while in a state of sexual arousal.

4. Plaintiffs' brief in opposition to Kemp's summary judgment motion states that the ceremony

was concluded by a "prayer hug". This is contradicted by Michael's deposition testimony.

5. The following is from the deposition testimony of Brian Shepard:

Q. Did there come a point in time that you terminated all further study sessions and hugging with him?

A. Along—the beginning of April, I didn't come out and tell him, but I just wouldn't be

Bradley, at his request, was baptized by Kemp on March 28, 1992 approximately one week after Brian. As with Brian, Bradley received religious instruction from Kemp in Kemp's classroom which included prayer hugs. In the late fall of his senior year Bradley ceased all prayer hugs with Kemp until the spring of 1993 when they continued until his graduation. Bradley's parents were never informed about the prayer hugs until May of 1993.

Mrs. Shepard contacted Principal Henry Wojochowski in June 1992. She discussed a letter she had found from Kemp to Michael dated April 28, 1992, which sounded like a love letter wherein Kemp described Michael as "the greatest love of my life." She also expressed a fear that Kemp would begin to influence the twins. Wojochowski had a hard time remembering exactly what was said, however, he does remember being told by her that Michael was living with Kemp and that she was afraid for the twins. He believed he spoke to Henry about the Shepard conversation one or two times. There was an incident involving Kemp using abusive language toward a student or students for which Wojochowski reprimanded Kemp and reported it to Henry. (See Doc. 99, Exhibit F).

Mrs. Shepard then went to Guidance Counselor Ackerman on July 22, 1992, and complained about Kemp's efforts at religious instruction with the twins. At Ackerman's suggestion, the Shepard parents met with Henry in July of 1992. They discussed the letter that Kemp wrote to Michael and their fears that Kemp would influence the twins. They mentioned the opinions of Rev. Minors that Kemp was a "closet homosexual" and the Potter County Mental Health Association that Kemp had engaged in religious abuse as well as another incident of Kemp interfering in a family relationship.

While their initial discussion involved Kemp's religious domination of Michael and

the "love letter" he had received from Kemp, they also expressed concern about the twins being exposed to him as students in their final year. "The main concern was that we wanted—we were concerned about the suicides [in the Valley] ... we were concerned about them being exposed to him." Connie Shepard Dep. at 154. Henry was asked if he could arrange a different schedule for the twins so they wouldn't have to take classes with Kemp but Henry advised that Kemp's course "Problems of Democracy" was a required course for graduation and that Kemp was the only one teaching that subject. Henry appeared to be really concerned and stated that he would inform the appropriate people at the high school and that Kemp would be monitored and the twins would be watched closely. As to whether they sought any further response or action by Henry, Mrs. Shepard answered, as follows:

Q. Other than you requesting that Dr. Henry check into some sort of different schedule for the twins, did you have any other specific requests for him in this meeting?

A. Did we have any—I don't believe so. We just didn't want them exposed to him. Connie Shepard Dep. at 159.

Additionally, Henry admitted to the Shepards that he was aware of problems with Kemp but that Kemp was near retirement age and they were hoping to get him out of the system.

After this meeting, Henry called School District Solicitor, Chris Mattie on July 23, 1992, but only mentioned Kemp's relationship with Michael[6] and was told by Mattie that nothing could be done since Michael had graduated. He also talked to Wojochowski on July 24, 1992, but only discussed Kemp's praying in school.

On August 10, 1992, while school was out of session for the summer, Mrs. Shepard

---

noticed. I would go down and work on a project in the shop or something or say I had homework and I was busy. I was making excuses, but I didn't want to hurt Mr. Kemp because I knew that he was taking ...

Q. Just so I'm clear, you're talking about the beginning of April of 1992?

A. Yes.

6. This would appear to be consistent with Henry's recollection that the Shepards only discussed Kemp's relationship with Michael and that no reference was made as to the twins.

again complained to Ackerman who, in turn, met with Henry. Ackerman told Henry that only tutoring was taking place between Bradley and Kemp and that it was his impression that any relationship between the twins and Kemp was occurring off the School District premises.[7] Henry reacted by saying "I don't know what we can do if it's not happening in the School." Ackerman Dep. at 21. Henry suggested that if it involved some activity off the school that the Shepards should consult the police or an outside agency. Henry told Ackerman that "he would be happy to talk to the Shepards". Ackerman Dep. at 22. In September, 1992, Ackerman had a meeting with the twins about their college plans but neither mentioned any problems with Kemp.

In January, 1993, Mrs. Shepard met with Dale Ishman, the High School Principal, on two occasions regarding her concerns about Kemp tutoring her son Bradley during non-school hours. Ishman monitored the tutoring sessions and issued a written letter of reprimand to Kemp regarding his permitting Bradley to take an examination off campus. This letter was provided to Henry and a copy was placed in Kemp's personnel file. Furthermore, Ishman and Henry agreed that Ishman would monitor Kemp as closely as he could by making periodic checks of his classroom. Henry "supported the idea of keeping a close observation on what was happening, observing his classroom to see what was there." Ishman Dep. at 35.

As stated by the plaintiffs "... in May of 1993, the Shepard children began to 'compare notes' about their experiences with Kemp. Further, by this time they gradually began to communicate these experiences to their parents. The children never communicated with their parents about Kemp before at his insistence." Doc. 98, p. 19. Therefore, this was the first time the Shepards learned of the extent of the relationship between their sons and Kemp with reference to religious proselytizing and sexual advances.

Having been fully informed about Kemp's involvement with their children, the Shep-

ards met with Henry on June 1, 1993.[8] At this meeting Henry was informed of the prayer hugs that Kemp gave the Shepard children and that Kemp was aroused sexually during these hugs. They discussed their concerns over suicide and the practice that Kemp had of "walking around the school in his boxer shorts." Connie Shepard Dep. at 220–226. Henry stated that he wanted to discuss the matter with the school solicitor, Chris Mattie and scheduled a meeting with the Shepards, Mattie and himself for the next day. Connie Shepard Dep. at 224.

On June 2, 1993, the Shepards and Sue Good met with Henry and Mattie. At this meeting all the allegations regarding Kemp were repeated, including the prayer hugs and Kemp's exposing himself to Michael. Mattie advised the Shepards not to discuss the matter with members of the School Board since they could eventually be involved in disciplinary proceedings against Kemp. Brian F. Shepard Dep. at 69. The Shepard boys never met face-to-face with Mattie to discuss the matter since they were embarrassed and in a fragile state. Brian F. Shepard Dep. at 70–73. The twins did, however, briefly speak with Mattie on the phone. The plaintiffs felt that Mattie lacked compassion during that conversation and "tried to make it sound like it was their [the twins] fault." Doc. p. 20. Accordingly, none of the Shepard children ever spoke to Mattie again.

The twins completed their classes on June 1, 1993, and graduated on June 5, 1993.

### Discussion

In *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986), the United States Supreme Court outlined the proper interpretation of Rule 56(c):

Under Rule 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving par-

7. The Shepards owned an ice cream shop where Kemp would stop and visit the boys for lengthy period of time when the parents were not present.

8. This meeting was also attended by Sue Good who was Mrs. Shepard's sister-in-law and Henry's secretary.

ty is entitled to a judgment as a matter of law." In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is entitled to a judgment "as a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of her case to which she has the burden of proof.

*Celotex,* 477 U.S. at 322–23, 106 S.Ct. at 2552. "All doubts as to the existence of a genuine issue of material fact must be resolved against the moving party, and the entire record must be examined in the light most favorable to the non-moving party." *Piezo Crystal Co. v. The Uddeholm Corp.,* 870 F.Supp. 589, 594 (M.D.Pa.1994). "Any credible evidence contrary to the moving party's version of events will defeat the summary judgment motion." *Losch v. Borough of Parkesburg, Pa.,* 736 F.2d 903, 908 (3rd Cir. 1984). In light of that standard, the court will now review the defendant's motion.

██ As a starting point, it should be noted that under the law in this Circuit, in a § 1983 action against school officials, a plaintiff must do more than show that a defendant could have averted a student's injury and failed to do so. "The mere failure of supervisory officials to act or investigate cannot be the basis of liability." *Stoneking v. Bradford Area School District,* 882 F.2d 720, 730 (3d Cir.1989). As stated in *Black by Black v. Indiana Area School District,* 985 F.2d 707 (3d Cir.1993),

> "In order to establish liability a plaintiff must demonstrate both that the defendant's policy, practice, or custom played an affirmative role in bringing about the sexual abuse and that the defendant acted with deliberate indifference to that abuse. In

order to establish deliberate indifference on the part of the defendant, 'something more culpable [must be shown] than a negligent failure to recognize [a] high risk of harm' to plaintiffs." *Id.* at 713 (citation omitted).

In *Stoneking, supra,* there was a pattern of reports of sexual misconduct and physical abuse reported to supervisors by students and teachers alike but, not only was there no action taken, the students in some instances were chastised and warned that it was merely their word against the teacher. In holding that sufficient evidence had been produced to withstand a motion for summary judgment, the court noted:

> "In sum, there is evidence in the record that between 1978 and 1982 Smith [Principal] and Miller [Assistant Principal] received at least five complaints about sexual assaults of female students by teachers and staff members; that Shuey [Superintendent] was told about some of these complaints; that Smith recorded these and other allegations in a secret file at home rather than in the teachers' personnel files, which a jury could view as active concealment; that the defendants gave such teachers excellent performance evaluations, which a jury could view as communication by the defendants to the teachers that the conduct of which they were accused would not be considered to reflect negatively on them; and that Smith and Miller discouraged and/or intimidated students and parents from pursuing complaints, on one occasion by forcing a student to publicly recant her allegation." *Id.* at 728–729.

Moreover, the factual background in this case must be put in perspective. Prior to July, 1992, when Mr. & Mrs. Shepard met with Henry, none of the children had told their parents of their experiences with Kemp. However, the parents were obviously suspicious having read the love letter from Kemp to Michael, being aware of Kemp's reputation for religious proselytizing, observing his visiting the twins at Shepard's ice cream store, hearing stories of student suicides, and having felt an estrangement of their children from them. They had report-

ed their concerns to Wojochowski who relayed this information to Henry. Wojochowski also reported to Henry that he had reprimanded Kemp for using abusive language toward a student. At the July meeting they conveyed these suspicions to Henry, outlining some information and rumors, *e.g.*, the opinion of Rev. Minors, and, because the twins were still in the school system, requested Henry's help in separating the twins from Kemp in the classroom. While this request could not be honored because Kemp taught a required course for gradation, Henry promised to monitor Kemp's activities and to watch the twins closely. Henry also expressed concern and stated that he was aware of problems with Kemp but knew he was near retirement age and was hoping to get him out of the system. Pursuant to this commitment, Henry contacted the School Solicitor Chris Mattie but only mentioned Kemp's relationship with Michael and not the twins. Mattie advised that there was nothing that Henry could do because Michael had graduated and was no longer in the school system. Henry also talked to former principal Wojochowski about Kemp's praying in school. In August, 1992, Henry had a conversation with Guidance Counselor Ackerman about Kemp and the twins but Ackerman expressed the belief that only tutoring was taking place and that it was occurring off the school's premises. Henry opined that the Shepards should seek the help of an outside agency concerning off the premises conduct by Kemp and stated that he was willing to talk to the Shepards about this. Apparently nothing further was done to implement this suggestion.

· In September, 1992, Ackerman met with the twins concerning their plans for college but neither mentioned Kemp. The next contact occurred in January, 1993, when Mrs. Shepard advised Principal Ishman, who apparently succeeded Wojochowski, on two occasions that she was disturbed because Kemp was tutoring her son Bradley during non-school hours. Ishman investigated by monitoring the tutoring sessions and issued a written reprimand to Kemp for allowing Bradley to take an examination off campus. This reprimand was provided to Henry and a copy place in Kemp's personnel file. According to Ishman, Henry supported the plan of periodic checks of Kemp's classroom and keeping it under close observation.

As previously noted, notwithstanding their parents' fears, none of the children revealed any objectionable conduct to their parents during this time period and, indeed, made no complaints of any kind to school officials. Certainly if the parents didn't know the particulars and extent of these relationships until May, 1993, there was no reason for Henry to be aware of them. In May, 1993, when the children gradually disclosed Kemp's abuses to their parents, they, in turn, arranged the June 1, 1993, meeting with Henry. After hearing their revelations, Henry requested that they meet with Solicitor Mattie on the following day. At this meeting on June 2, 1993, after hearing the Shepards sordid tale, Mattie attempted to discuss the details with the children but because of an apparent personality conflict, the boys refused to talk to him about the incidents. The twins completed their class work on June 1, 1993, and were formally graduated on June 5, 1993. Consequently, insofar as the twins were concerned, they were no longer students in the district and district officials had no further authority with respect to correcting any future abuses.

### Analysis

■ The only named defendant is Henry and there is no competent evidence linking any School Board members to the alleged policy or to deliberate indifference. Therefore, the conduct of Henry must be analyzed not only concerning his individual liability but also his official liability, and derivatively that of the district, as the Chief Administrator in the School System. It will be assumed that Henry, and not only the School Board, had the authority to set policy, practice or custom in the district. *But see, Gates v. Unified School Dist. No. 449*, 996 F.2d 1035, 1043 (10th Cir.1993).

The policy here would have to be a practice or custom of permitting teachers to engage in unconstitutional conduct toward students by physical and sexual abuse, religious indoctrination and interference with the fami-

ly relationship. Moreover, this practice would have to play an affirmative role in bringing about the constitutional deprivations. Furthermore, with this policy or custom in place, the defendants would have to be deliberately indifferent to the application of this policy or custom to the plaintiffs.

The evidence in this case fails to establish the existence of a policy, practice or custom in the Oswayo School System that played an affirmative role in causing constitutional deprivations. While there are numerous incidents and rumors concerning Kemp's relationship with the Shepard youngsters and other students, none of them implicate Henry or the School District to the degree that it can be concluded that the failure to train, supervise, oversee, discipline, or remedy, constituted a policy, practice or custom that played an affirmative role in bringing about those incidents. There is no evidence of concealment, of encouragement or acceptance of improper behavior of Kemp and there is an absence of teacher complaints or intimidation or discouragement of student complainants. The record simply does not disclose "a pattern of persistent and widespread unconstitutional practices that had become so permanent and well-settled as to have the force and effect of law." *Jane Doe A. v. Special School District,* 901 F.2d 642, 646 (8th Cir.1990); *Gates v. Unified School Dist. No. 449,* 996 F.2d 1035 (10th Cir.1993) (plaintiff must prove: (1) the existence of a continuing, persistent, and widespread practice of unconstitutional misconduct by the School District's employees; (2) deliberate indifference to or tacit approval of such misconduct by the school district's policy making officials (Board) after notice to the officials of that particular misconduct, and (3) that the plaintiff was injured by virtue of the unconstitutional acts pursuant to the board's custom and that the custom was the moving force behind the unconstitutional acts.)

Plaintiff's reliance on *C.M. v. Southeast Delco School District,* 828 F.Supp. 1179 (E.D.Pa.1993) and *K.L. v. Southeast Delco School District,* 828 F.Supp. 1192 (E.D.Pa. 1993) is misplaced. The factual situations in those cases were far more extreme and pervasive than existed here. In both cases, at least five teachers complained to school officials repeatedly about witnessing abuse and offensive conduct of a Special Education teacher towards his students. In both cases, the accused teacher and individual school officials were the same. The complaints from the teachers included striking students, spraying them with water and Lysol, physically abusing them until they cried for help, unauthorized touching of students, requiring students to stay in his classroom until the last school bus departed and then driving them home, openly looking up the dresses of female students and, on one occasion, tripping a female student and then picking her up by her breasts. 828 F.Supp. at 1181–1183. Plaintiff C.M. asked to be transferred from the teacher's class because he was afraid of him and revealed that the teacher would arrange to drive him home, park in undesirable neighborhoods and rub his knee and upper thigh while making sexual remarks. 828 F.Supp. at 1183. The court concluded that the information conveyed to school officials could reasonably show that the teacher was a depraved and dangerous man. 828 F.Supp. at 1185. The conduct of the teacher was conveyed to school authorities at least once a week during the school year and it was common knowledge that his contacts with children had been investigated by the local Police Department. *Id.*

The initial reaction of school officials in those cases was to quietly observe the teacher and, after the Plaintiff student reported his problems directly to the Superintendent, Principal and Assistant Principal, they decided to monitor the teacher's classroom, to inform him that he was to stop driving students home and to be out of the school by 4:00 P.M. every day. In addition, a file was set up to document reports about the teacher but the Superintendent requested that the incident was to be kept quiet and no one was to be told about it. 828 F.Supp. at 1183.

This weak response despite direct and consistent notice from teachers of outrageous and dangerous conduct by a Special Education teacher was determined by the Court to create factual questions from which a jury could reasonably conclude that the actions taken or not taken by school officials amount

to a custom, practice, or policy of deliberate indifference to the teacher's actions and to Plaintiff's constitutional rights.

A review of the factual background in *C.M.* and *K.L.* demonstrates the broad disparity in those cases with the case before us. Those cases were characterized by several factors not present here, *viz.*, the widespread number, persistence, seriousness, specificity, and repetition of the incidents; the reliability of the sources of the reports; the factual revelation of the student plaintiff personally to school officials; and the precise knowledge of school authorities of the details of the complaints. Consequently, neither case offers much support to Plaintiff's argument.

■ Nevertheless, even assuming the existence of an objectionable policy, practice or custom, there is an inadequate showing of deliberate indifference on the part of Henry and school officials. Deliberate indifference must be something more culpable than a negligent failure to recognize a high risk of harm to the plaintiffs and the mere failure to act or investigate cannot be the basis of liability. *Black*, 985 F.2d at 712.

But just what did Henry know prior to June 1, 1993, about Kemp's behavior and his relationship with the Shepard children? At the July, 1992, meeting he mentioned to the Shepards that he was aware of problems with Kemp although the nature of these problems was never revealed. He was told by the Shepards of their concern for their children although, at that point in time, while their suspicions were understandable, they had no evidence of actual misconduct because their children had not revealed their experiences to their parents until May, 1993. Of course, the Shepards had the love letter from Kemp to Michael and were aware that he was living with Kemp but Michael was no longer a student at the school. There were reports of the twins spending an inordinate amount of time with Kemp but, again, the twins did not disclose any wrongdoing. The parents told Henry of their concerns about suicides in the valley, about a story of Kemp interfering with another family relationship as well as purported opinions of others concerning Kemp. Wojochowski had informed Henry of a reprimand he issued to Kemp concerning abusive language toward another student. Ackerman discussed the Shepard's fears with Henry but indicated to Henry that Kemp's tutoring of the twins was taking place outside the school. Mrs. Shepard talked to Ackerman about Kemp influencing the boys religiously but never mentioned sexual abuse. Ishman apprised Henry of a reprimand he had given to Kemp for allowing Bradley to take an examination off school premises. They agreed to observe Kemp closely and to check on him in his classroom.

At most, Henry was negligent in failing to recognize a high risk of harm to the plaintiffs because of Kemp's actions and his failure to act or investigate their complaints under these circumstances cannot be the basis of liability. In fact, Henry did act. He contacted Solicitor Chris Mattie in July, 1992, and again in June, 1993. He expressed concern to the Shepards at their first meeting and explained that a course change could not be made because Kemp was the only one to teach a required course. The only action requested of him at that meeting was to attempt to arrange a different schedule and that limited request was understandable in view of the fact that no one knew the extent of Kemp's alleged misconduct until ten months later in May, 1993, when the children informed their parents. In August, 1992, Henry discussed the twins situation with Ackerman and was advised that their contact with Kemp was off the school premises and, that being so, Henry suggested that the Shepards contact an outside agency and that he would be happy to talk to the Shepards about it. This offer to Ackerman to convey to the Shepards is also understandable inasmuch as Connie Shepard had previously consulted with Ackerman on two occasions.

After the January, 1993 meeting between the Shepards and Ishman, Henry requested Ishman to closely monitor Kemp and to make periodic checks of his classroom. This appears to be the last incident, *vis a vis* the Shepards and Henry, until the June 1, 1993 meeting following the disclosures in May, 1993, from the children to their parents. At that time, however, with the imminent graduation of the twins, nothing could be done

insofar as their problems with Kemp were concerned.

In sum, Henry had reason to know of Kemp's reputation for associating with students off campus and imparting religious instruction and that some believed he was a homosexual and a religious abuser. But his information about Kemp and the Shepard boys was largely limited to objectionable religious indoctrination which was supposedly occurring off school premises.

Some questions immediately surface. Should Henry have discussed the Shepards' complaints directly with Kemp? Probably, he should have. Should he have attempted to maintain closer contact with the Shepards after their meeting in June, 1992? Probably, he should have. Should he have enlisted the aid of other supervisors to monitor Kemp more closely? It probably would have been better if he had. But all of these alleged failures and derelictions do not add up to a deliberate indifference as defined by our appellate courts. He may have been negligent in failing to recognize a high risk to the plaintiffs but he did act and investigate although, arguably, inadequately. Nonetheless, his actions, or failure to act, do not rise to the level of deliberate indifference.

 As to plaintiff's alternative contention that a school supervisor owes an affirmative duty to protect school children in their custody, it must be rejected on the rationale of *Black by Black v. Indiana Area School District*, 985 F.2d 707 (3d Cir.1993). In *Black*, it was held that no special relationship existed between students and public school officials that would create an affirmative duty of care. *Id.* at 713. The recognition of a separate affirmative duty to protect students from their teachers as identified in *C.M. v. Southeast Delco School Dist.*, 828 F.Supp. 1179 (E.D.Pa.1993) will not be adopted here. The reasoning set forth to distinguish this theory from the rationale of *Black* is unpersuasive.

 Furthermore, the court concludes that Henry had no knowledge of any relationship between Michael Shepard and Kemp while Michael was a student in the Oswayo School District. Michael graduated from the school in June, 1991, one year before Henry

was made aware of any relationship between them. In addition, Henry and the School District had no right to intervene in an out-of-school relationship between a teacher and a former student. *See K.L. Southeast Delco School Dist.*, 828 F.Supp. 1192, 1199 (E.D.Pa. 1993).

 Additionally, it must be noted that while the above discussion focuses primarily on the sexual/religious relationship between Kemp and the boys, the same analysis applies to the interference with family relationship claim. Plaintiffs argue that the defendants used the power of the state to "destroy the bonds" between the boys and their parents. There is absolutely no evidence of record that would suggest that Henry or the District attempted to engage in such conduct or maintained a policy, custom or practice of allowing teachers to interfere with the family relations of students. Accordingly, the defendants are entitled to summary judgment of this claim as well.

Finally, in light of the disposition of the federal claims, the court will not assert jurisdiction over the pendent state counts. *United Mine Workers v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966); 28 U.S.C. § 1367(c)(3); *Lahaza v. Azeff*, 790 F.Supp. 88, 93 (E.D.Pa.1992).